IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION



MIDATLANTIC INTERNATIONAL, INC.,

    Plaintiff

    v.

CIVIL NO. 2:12cv169

AGC FLAT GLASS NORTH AMERICA, INC.,

    Defendant.

## OPINION AND ORDER

This matter comes before the Court on motions of Defendant AGC Flat Glass North America ("AGC") for Partial Summary Judgment, ECF No. 87, and to Stay and Compel Arbitration, ECF No. 118. This opinion sets forth in writing the reasons for the Court's rulings at the telephonic hearing on February 6, 2014. For the reasons set forth herein, the Court **GRANTS** the Motion for Partial Summary Judgment as to the question of what constituted the contract between the parties and **DENIES** the remainder of the motion. Additionally, the Court **DENIES** the Motion to Stay and Compel Arbitration.

    I.    **STANDARD OF REVIEW**

As to the first motion for partial summary judgment, summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the moving party is thereby entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "A material fact is 'one that might affect the outcome of the suit under the governing law.' A disputed fact presents a

genuine issue 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505 (1986).

As to the second motion requesting that the Court compel arbitration:

> [u]nder the [Federal Arbitration Act], a party may lose its right to compel arbitration if it "is in default in proceeding with such arbitration." This principle of "default" is akin to waiver, but not identical. Unlike some waiver doctrines, "the circumstances giving rise to a statutory default are limited and, in light of the federal policy favoring arbitration, are not to be lightly inferred," and the party opposing arbitration bears a heavy burden to prove default.

*Rota-McLarty v. Santander Consumer USA, Inc.*, 700 F.3d 690, 702 (4th Cir. 2012) (citations omitted).

## II. FACTUAL AND PROCEDURAL BACKGROUND

This case is, ultimately, about what constituted the contract between AGC and Plaintiff MidAtlantic International, Inc. ("MidAtlantic") and whether or not the product that was provided conformed to the specifications of the contract. At this stage in the proceedings there are still many disputed facts which prevent the Court from fully granting the Motion for Partial Summary Judgment. However, there are enough undisputed facts for this Court to make a determination of what constituted the terms of the agreement between the parties, and those facts are as follows.

By 1997 MidAtlantic Minerals, Inc., an affiliate of MidAtlantic, had begun delivering Spanish dolomite to AFG Industries, Inc., who was AGC's predecessor, for use in its solar glass plant in Kingsport, Tennessee. Within a few years, the contractual relationship evolved into one between MidAtlantic and AGC. From the late 1990s until the end of 2011 AGC (and its

predecessor AFG) was regularly supplied with dolomite by MidAtlantic (and its affiliate MidAtlantic Minerals). MidAtlantic obtained the dolomite from a mine in Spain. Before being shipped to the United States, the dolomite would be tested for certain chemical qualities. The resulting Certificate of Analysis would then be provided to AGC upon delivery. MidAtlantic shipped the dolomite from Spain to a warehouse in Norfolk, Virginia. After AGC placed an order, the dolomite would be delivered to Kingsport via rail.

At the end of every calendar year AGC would send MidAtlantic a seven page long purchase order that would provide a rough estimate of AGC's dolomite needs for the coming year. That annual purchase order would be supplemented by monthly purchase orders that provided a more exact request for dolomite. Each separate order would set forth the requirements and conditions for the delivery of the dolomite. The quantity of dolomite set forth in the monthly purchase orders would then occasionally be slightly altered via email and telephone conversations between the parties before the dolomite was actually shipped from the warehouse in Norfolk to the Kingsport plant.

Each and every purchase order contained, among other things, certain requirements concerning the technical specifications of the dolomite. The requirements specifically set forth the chemical composition and physical properties, including the maximum allowable levels of iron, silicon dioxide, and acid insoluble particles. In addition, this included a requirement that "no acid insoluble particle shall be coarser than 30 mesh," which is equivalent to .6 millimeters ("30 mesh requirement"). That requirement was included on all purchase orders during the relevant time period. Also included with the purchase orders was a set of Terms and Conditions. Paragraph 13 of those Terms and Conditions stated that "[a]ny disagreement or litigation which may occur in relation with or further to this order . . . will definitely be settled by arbitration and

to the exclusion of courts." The purchase orders also contained the price of the dolomite, the expected quantity, the maximum allowable levels of iron content (by MidAtlantic's own admission the most important chemical specification), how the "agreement" could be cancelled, detailed shipment requirements, and numerous other specifications that one would expect to find in order for both sides to understand how the transactions were to take place.

On January 14, 2008, MidAtlantic sent a letter to AGC requesting that a "take or pay" clause be added to their agreement ("2008 Letter"). This clause would require AGC to pay MidAtlantic for any dolomite remaining in the Norfolk warehouse should AGC decide to stop purchasing dolomite from MidAtlantic. The letter also stipulated that AGC would continue to purchase dolomite until at least December 31, 2010 at a set price.[1] AGC eventually signed the letter on October 10, 2008.

In the meantime, in May of 2008 MidAtlantic also requested that changes be made to the purchase orders. Included in those changes was a repeated request that AGC adopt a take or pay clause. MidAtlantic itself marked up a past purchase order and sent the edited purchase order reflecting the proposed changes to AGC. On December 19, 2008, MidAtlantic sent an email to AGC noting that the blanket order for 2009 had not yet incorporated the requested changes. In response to MidAtlantic's requests, AGC <u>subsequently altered the purchase orders</u> to reflect the take or pay provision.[2]

This case is concerned with dolomite that was shipped in 2011. The purchase orders for those shipments continued to include the 30 mesh requirement, the take or play clause, and the arbitration clause found in the Terms and Conditions. As will be discussed further in this opinion, the Court finds that those purchase orders and the attached Terms and Conditions

---

[1] The relationship was later extended beyond 2010.
[2] The final version of the take or pay provision capped the amount of dolomite that AGC might be liable for at 15,000 short tons.

constitute the contract in this case. The facts of what did and did not happen during the second half of 2011 and the beginning of 2012 are contested by the parties. What certainly did happen was that AGC ultimately rejected any future purchases of Spanish dolomite from MidAtlantic on the grounds that the dolomite did not meet the 30 mesh requirement, and AGC refused to pay for the remaining dolomite in MidAtlantic's warehouse on the same grounds.

AGC initially filed suit in Tennessee state court on March 9, 2012, for breach of contract and damages resulting from the breach. MidAtlantic then filed its complaint in the instant case on March 30, 2012. The Tennessee case was subsequently dismissed, leaving the parties to litigate the matter in this Court. On January 3, 2014, AGC filed its Motion for Partial Summary Judgment. On February 4, 2014, AGC filed its Motion to Stay and Compel Arbitration only days before the February 11, 2014 trial date. After review of the submitted documents and a hearing on February 6, 2014, both motions are ripe for decision.

### III. ANALYSIS

#### A. THE PURCHASE ORDERS EMBODY THE CONTRACT, INCLUDING THE 30 MESH REQUIREMENT

In the Motion for Partial Summary Judgment, AGC asks the Court to find (1) that the purchase orders are the contract upon which their relationship with MidAtlantic was based, (2) that AGC lawfully refused to purchase dolomite from MidAtlantic claiming that the dolomite did not conform to the contract specifications, and (3) that AGC's course of performance did not amount to a modification or waiver of the 30 mesh requirement. There are issues of material fact that prevent the Court from granting the motion as to the second and third request. However, there is sufficient information before the Court such that the Court finds as a matter of law that the purchase orders embody the agreement between the parties as to the terms and conditions of the contract.

5

AGC's consistent contention has been that the purchase orders for the dolomite contained the terms of the agreement between the parties. It is more difficult to define how exactly MidAtlantic would define the contract between the parties. MidAtlantic seems to assert that the terms of the contract are established via some combination of the initial documents exchanged between the parties in 1997/98, the course of dealing between the parties from the late 1990s through 2011, Certificates of Analysis ("COAs") detailing the chemical composition of the dolomite, and the 2008 Letter. What MidAtlantic has definitely asserted is that the purchase orders were not part of the contract and that the 30 mesh requirement was never part of the contract either.

The agreement between the parties is governed by the Uniform Commercial Code.[3] The UCC provides that a "contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." Tenn. Code Ann. § 47-2-204(1).[4] The UCC further states that "an order or other offer to buy goods for prompt or current shipment shall be construed as inviting acceptance either by a prompt promise to ship or by the prompt or current shipment of conforming or non-conforming goods." Tenn. Code Ann. § 47-2-206.

In general, a purchase order is deemed to be an offer which may be accepted by subsequent action on the part of the seller:

> "[T]he offer usually takes the form of a purchase order, providing product choice, quantity, price, and terms of delivery." [*Audio Visual Associates Inc. v. Sharp Electronics Corp.*, 210 F.3d 254, 259 (4th Cir. 2000)]. Consequently, "[a]s a general rule, the submission of a purchase order by a prospective buyer is viewed

---

[3] On the night before the Final Pretrial Conference MidAtlantic filed a brief claiming that the contract is actually governed by the United Nations Convention on Contracts for the International Sale of Goods ("CISG"). However, that treaty was not signed by Barbados, the country where MidAtlantic is based, and so it is not applicable.

[4] Prior to asserting that the CISG applied in this case MidAtlantic asserted that the Virginia provisions of the UCC should apply instead of the Tennessee provisions. Because the relevant parts of the Virginia and Tennessee codes are identical it does not change the analysis. Since the Terms and Conditions of the purchase orders dictate that Tennessee law applies, however, the Court will cite to the Tennessee statute.

6

as an offer which may then be accepted or rejected by a seller." *J.B. Moore Elec. Contractor, Inc. v. Westinghouse Elec. Supply Co.*, 221 Va. 745, 273 S.E.2d 553, 556 (1981).

*Kraft Foods N. Am., Inc. v. Banner Eng'g Sales, Inc.*, 446 F. Supp. 2d 551, 569 (E.D. Va. 2006). MidAtlantic contends that the purchase orders in this case were "at best" confirmatory memoranda. However, this contention requires the Court to reject a written document that contains all of the necessary information for the completion of the sale of the dolomite in favor of an amorphous contract.

As noted above, MidAtlantic's proposed contract appears to be provided by a combination of the initial documents exchanged between the parties in 1997/98, the course of dealing between the parties between the late 1990s and 2011, the COAs, and the 2008 Letter. The purchase orders actually incorporate the requirements of the 2008 Letter. In fact, MidAtlantic specifically and repeatedly requested that the take or pay provision of the 2008 Letter be incorporated into the purchase orders, along with other edits and alterations. MidAtlantic has been unable to satisfactorily explain why they insisted on including those terms in the purchase orders when they now claim the purchase orders never bound them in any way and were merely used for AGCs accounting purposes.

The purchase orders already reference and call for the COAs. MidAtlantic argues that the lack of any 30 mesh specification in the COAs confirms the fact that if the purchase orders are the contracts then the contract would be self-contradictory or incomplete. However, there is nothing in the COAs that contradicts the 30 mesh requirement,[5] and since the COAs are referenced by the purchase orders it is unclear how the purchase orders could thereby be incomplete.

---

[5] It would be odd indeed to infer contradiction by silence on this.

7

As to the initial document exchanges from the late 1990s and the course of dealing, this evidence could be relevant if it could be used to explain or supplement (but not contradict) a written term. Under the UCC, a final writing "may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be *explained or supplemented* by course of performance, course of dealing or usage of trade." Tenn. Code Ann. § 47-2-202 (emphasis added). MidAtlantic asks this Court to ignore the express written provision of the 30 mesh requirement in favor of early dealings and a general course of dealing that is simply silent as to the requirement.[6]

Ultimately, MidAtlantic's position must fail because they ask the Court to ignore a complete and unambiguous written document in favor of a vague composite of writings, letters, oral agreements, and course of dealings that would contain several components that are incorporated into the purchase order anyway. Given the case law's general rule that "the offer usually takes the form of a purchase order," *Audio Visual Assoc.'s*, 210 F.3d at 259, and that the purchase order was so comprehensive compared to any other alternative that MidAtlantic has suggested to the Court, the Court finds that the purchase orders were offers that were accepted by MidAtlantic when it engaged in performance based on the requirements and specifications of the purchase orders. While MidAtlantic can argue that other parts of the purchase orders may or may not be ambiguous, there was nothing unclear about the 30 mesh requirement or the other specifications for the dolomite that required explanation or supplementation. Therefore, the Court **FINDS** that the purchase orders embodied the contract between MidAtlantic and AGC, and that the 30 mesh requirement was a part of that contract.

---

[6] MidAtlantic provided to the Court a declaration of Jose Boves, a former part-owner or MidAtlantic who was involved in establishing the initial commercial relationship, wherein Boves claims that AGC affirmatively waived the 30 mesh requirement during the initial contract negotiations. This is not relevant to the determination of what the contract is but rather would go to the issue of waiver. Even if it were relevant, it would be an invalid attempt at contradicting an express and unambiguous written term by way of an earlier oral representation.

### B. AGC AFFIRMATIVELY WAIVED ITS RIGHT TO ENFORCE ARBITRATION

Most of the case law dealing with the issue of whether a party is in default with regard to enforcing a contractual arbitration clause deals not with situations where the moving party has explicitly forfeited their right to enforce arbitration but rather where the non-moving party asserts that the moving party has implicitly waived their right through use of the courts. "Generally, a litigant defaults on its right to invoke the FAA where it 'so substantially utiliz[es] the litigation machinery that to subsequently permit arbitration would prejudice the party opposing the stay.'" *Rota-McLarty*, 700 F.3d at 702 (citations omitted). However, this case presents a fairly unique situation because the moving party, AGC, has affirmatively waived its right to compel arbitration. Paragraph 20 of the Terms and Conditions section of the purchase orders (which AGC has always contended embodied the contract between the parties) clearly provides for the possibility of waiver of any "provisions of this contract" and for how waiver of any particular provision does not waive any other provisions. Therefore, there is no question that any or all clauses were subject to waiver and the waiver of a clause would not affect any other clauses. Therefore, the mandatory arbitration clause contained in Paragraph 13 could be waived.

During the Final Pretrial Conference the undersigned began the hearing by asking why this Court had jurisdiction in light of the mandatory arbitration clause. Counsel for MidAtlantic informed the Court that early in the proceedings the parties, through counsel, agreed that neither side wanted to utilize arbitration.[7] Counsel for AGC did not, at the hearing or subsequently, dispute that such a waiver was mutually agreed to. Only after the Final Pretrial Conference and entry of the Final Pretrial Order of 107 pages did AGC change its previous position that they not arbitrate. In fact, at the Final Pretrial Conference the undersigned required both sides to submit

---

[7] MidAtlantic also disputed that it was bound by the arbitration clause because it still maintained that the purchase orders were in no way binding agreements between the parties. However, as discussed above the purchase orders formed the contract.

9

up to five cases that were relevant to the question of whether this Court had jurisdiction over the matter in light of the arbitration clause. When AGC's counsel submitted those cases there was still no mention of either a desire to arbitrate or, more importantly, any denial of the representation that both parties had mutually agreed to not pursue arbitration. The Court is left with no other alternative than to **FIND** that AGC affirmatively and explicitly waived any right to enforce the arbitration clause that it now seeks to enforce a few days before trial.

## IV. CONCLUSION

For the reasons set forth herein, the Court **GRANTS** the Motion for Partial Summary Judgment in part in so far as the Court **FINDS** that the purchase orders contained the terms of agreement of the contract between MidAtlantic and AGC. Because of the existence of genuine disputes of material fact, the Court **DENIES** the Motion for Partial Summary Judgment in part as to the questions of whether AGC lawfully rejected the dolomite, whether AGC waived any part of the purchase orders' specifications, or generally whether the dolomite conformed to the contract. The Court **DENIES** the Motion to Stay and Compel Arbitration and **DENIES** the Defendant's current motion to arbitrate.

The Clerk is **DIRECTED** to forward a copy of this Order to all Counsel of Record.

**IT IS SO ORDERED.**

/s/
Robert G. Doumar
Senior United States District Judge
_____
UNITED STATES DISTRICT JUDGE

Norfolk, VA
February __, 2014